

**Brenda K. Martin, Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| SKYMALL, LLC, | Case No. 2:15-bk-00679-BKM |
| Debtor. | |
| Jointly Administered with: | Jointly Administered with Case Nos.: |
| XHIBIT CORP., | 2:15-bk-00680-BKM |
| XHIBIT INTERACTIVE, LLC, | 2:15-bk-00682-BKM |
| FLYREPLY CORP., | 2:15-bk-00684-BKM |
| SHC PARENT CORP., | 2:15-bk-00685-BKM |
| SPYFIRE INTERACTIVE, LLC, | 2:15-bk-00686-BKM |
| STACKED DIGITAL, LLC, and | 2:15-bk-00687-BKM |
| SKYMALL INTERESTS, LLC. | 2:15-bk-00686-BKM |

| | |
|---|---|
| This Pleading applies to: | **ORDER AUTHORIZING SALE OF CERTAIN ASSETS BY DEBTOR SKYMALL, LLC FREE AND CLEAR OF CLAIMS, LIENS, ENCUMBRANCES AND OTHER INTERESTS** |
| ☐ All Debtors | |
| ☑ Specified Debtor | |
| **SKYMALL, LLC** | |

This matter came before the Court on March 27, 2015 for a hearing (the "**Sale Hearing**") on the *Motion For Orders (I) Authorizing Bidding Procedures And Auction, (II) Scheduling Sale Hearing And Approving Notice Thereof, (III) Authorizing Sale Of Assets, And (IV) Granting Related Relief* [Docket No. 22] (the "**Sale Motion**") filed by SKYMALL, LLC, *et al.*, the debtors and debtors-in possession (collectively, the "**Debtors**") in the above-captioned Chapter 11 cases

(the "**Bankruptcy Cases**"). In the Sale Motion, the Debtors request that the Court authorize a sale of certain assets of Debtor SkyMall, LLC ("**SkyMall**") free and clear of all claims, liens, encumbrances, and other interests pursuant to Bankruptcy Code § 363(f) (with liens (if any) to attach to the proceeds of the sale).

Based on the Sale Motion, the Declaration of Jeffrey R. Manning submitted by the Debtors in support of the Sale Motion (the "**Manning Declaration**"), the Sales Procedure Order (described below), the argument of counsel at the Sale Hearing, and the entire record before the Court, the Court hereby finds and concludes as follows:

A. The Court has jurisdiction to consider the Sale Motion under 28 U.S.C. §§ 157 and 1334, and the Sale Motion presents a core proceeding under 28 U.S.C. § 157(b)(2).

B. Among other relief, the Debtors requested in the Sale Motion that the Court authorize bidding and related sale procedures for a proposed auction sale of SkyMall assets. On January 27, 2015, the Court held an initial hearing on the Sale Motion (the "**Procedures Hearing**") to consider approval of the proposed auction sale procedures and related matters. Thereafter, the Court entered its *Order Establishing Bidding Procedures For Auction Sale, Scheduling Hearing On Sale Motion, And Granting Related Relief* dated January 29, 2015 [Docket No. 53] (as amended by Docket No. 131, the "**Sale Procedures Order**"), approving, among other things, the Sale Procedures (attached to the Sale Procedures Order as Exhibit 1) for an auction sale of certain SkyMall assets.[1]

C. On January 29, 2015, the Debtors served the initial Sale Procedures Order on the parties as stated in certificate of service filed at Docket No. 57, and on February 26, 2015, the Debtors served the Sale Procedures Order, as amended, on the parties as stated in the certificate of service filed at Docket No. 134. Pursuant to Bankruptcy Rules 2002 and 6004, the service

---

[1] Unless stated otherwise herein, terms defined in the Sale Motion, the Sale Procedures, and the C&A Purchase Agreement (defined below), as applicable, will have the same meanings when used in this Order.

provided constitutes good, sufficient, and appropriate notice of the Sale Motion, the Auction and the Sale Hearing.

D.     In accordance with the Sale Procedures Order, the Debtors conducted the Auction on March 25, 2014.  Jeffrey Manning of CRCMS presided over the Auction at the direction of the Debtors.  Two Qualified Bidders -- C&A Marketing, Inc., a New Jersey corporation ("**C&A**" or "**Buyer,**" which terms shall include any newly formed entity designated by C&A to consummate the transactions contemplated hereunder) and FSG Distributors ("**FSG**") -- participated in the Auction.  In addition, representatives and advisors of the Debtors, the Official Committee of Unsecured Creditors (the "**Creditors Committee**"), the Official Committee of Restricted Security Holders of Xhibit Corp. (the "**Equity Committee**"), and Connexions Loyalty, Inc. ("**Connexions**"), and a representative of the U.S. Trustee (among others) attended the Auction.

E.     As demonstrated by the evidence proffered or adduced at the Sale Hearing and the representations of counsel at the Sale Hearing, the Debtors and their representatives have complied in all respects with the Sale Procedures Order.  The Debtors and their representatives have, under the circumstances, adequately and appropriately marketed the Purchased Assets.  The Auction was duly noticed and conducted in a diligent, non-collusive, fair and good faith manner, and the Auction process set forth in the Sale Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to qualify as a bidder, participate in the Auction and to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors (i) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and (ii) considered any bids submitted on or before the deadline established by the Court for the submission of bids.

F.     At the conclusion of the Auction, the Debtors, with the consent of the Creditors Committee and following consultation with the Equity Committee representatives, (i) determined that C&A is the Prevailing Bidder based on the terms and conditions of its bid as set forth in the Asset Purchase Agreement to be executed by C&A and SkyMall, substantially in the form

-3-

attached to this Order as **Exhibit 1** (the "**C&A Purchase Agreement**"); and (ii) approved the bid of FSG described below (the "**FSG Bid**"), as the Backup Bid. The C&A Purchase Agreement, including the form and total consideration to be realized by SkyMall thereunder, (i) constitutes the highest and best offer received by SkyMall for the Purchased Assets; (ii) is fair and reasonable; and (iii) is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

G.      The Debtors' determination that the consideration provided by C&A under the C&A Purchase Agreement is the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

H.      Consistent with its fiduciary duties, SkyMall has demonstrated good, sufficient and sound business reasons and justifications for entering into, and the performance of its obligations under, the C&A Purchase Agreement, including, but not limited to, the following: (i) the consideration provided by C&A under the C&A Purchase Agreement will provide a greater recovery for the Debtors than would be provided by other available alternatives, and (ii) unless the sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the C&A Purchase Agreement, the recoveries of creditors will be diminished.

I.      The C&A Purchase Agreement and the transactions related thereto were negotiated and have been and are undertaken by the Debtors and C&A at arm's length, without collusion and in good faith within the meaning of the Bankruptcy Code §363(m). The entire sale process, including, without limitation, the Auction, was conducted in good faith within the meaning of Section 363(m). As a result of the foregoing, C&A is a good faith purchaser under Section 365(m), and SkyMall and C&A are entitled to all of the protections of Section 363(m). C&A will rely, and is entitled to rely, on this finding by the Court to close the sale of the Purchased Assets (as defined in the C&A Purchase Agreement, the "**Purchased Assets**") pursuant to the C&A Purchase Agreement at any time after the entry of this Order.

-4-

J.      C&A and the Debtors have not engaged in any conduct that would cause or permit the C&A Purchase Agreement to be avoided pursuant to Bankruptcy Code §363(n).

K.      Sound business reasons exist for the sale of the Purchased Assets by SkyMall pursuant to the C&A Purchase Agreement.  SkyMall's entry into the C&A Purchase Agreement and consummation of the transactions contemplated thereby constitute the exercise by SkyMall of sound business judgment and such acts are in the best interests of SkyMall, its estate and creditors.

L.      SkyMall: (a) has full power and authority to execute the C&A Purchase Agreement and all other documents contemplated thereby on behalf of SkyMall and its estate, and the sale of the Purchased Assets by SkyMall has been duly and validly authorized by all necessary corporate action; and (b) has all power and authority necessary to consummate the transactions contemplated by the C&A Purchase Agreement.  No other consents or approvals are required for SkyMall to consummate such transactions on behalf of SkyMall and its estate.

M.      The transfer of the Purchased Assets to C&A pursuant to the C&A Purchase Agreement is a legal, valid, and effective transfer of the Purchased Assets, and will vest C&A with all right, title, and interest of SkyMall and its estate to the Purchased Assets free and clear of all claims, liens, encumbrances, and other interests of any kind.

N.      All requirements of Bankruptcy Code §§ 363(b) and (f), and any other applicable law relating to the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to the C&A Purchase Agreement, have been satisfied.  On behalf of its estate, SkyMall may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests because, in each case, one or more of the standards set forth in Section §363(f)(1)-(5) has been satisfied.  Any holder of a lien, encumbrance, or other interest in or against any of the Purchased Assets that did not object to the Sale Motion is deemed to have consented pursuant to Section §363(f)(2).

O. The transactions reflected in the C&A Purchase Agreement represent the highest and best offer received by the Debtors for the Purchased Assets. As authorized under Section 363, SkyMall has determined in its business judgment, and in consultation with the Creditors Committee and the Equity Committee, that the C&A offer is the highest and best offer.

P. After due and proper notice of the Sale Motion and the Sale Hearing, the following sale objections (collectively, the "**Sale Objections**") were filed:

- *U.S. Securities and Exchange Commission's Limited Objection to Sale of Assets* [Docket No. 153] (the "**SEC Objection**"), filed by the U.S. Securities and Exchange Commission (the "**SEC**") on March 3, 2015;

- *Limited Preliminary Objection to the Sale Motion and Cure Notice and Reservation of Rights* [Docket No. 177] (the "**Connexions Objection**"), filed by Connexions Loyalty, Inc. ("**Connexions**") and SkyMall Ventures, LLC ("**Ventures**") on March 4, 2015;

- *Official Committee of Restricted Equity Security Holders' of Xhibit Corp.'s Objection to Debtors' Motion for Orders Authorizing Sale of Assets, Et Al.* [Docket No. 178] (the "**Equity Committee Objection**"), filed by the Official Committee of Restricted Equity Security Holders' of Xhibit Corp. (the "**Equity Committee**") on March 4, 2015; and

- *United States Trustee's Objection to Sale Motion and Reservation of Rights* [Docket No. 179] (the "**UST Objection**"), filed by the United States Trustee (the "**UST**") on March 4, 2015.

Q. All of the Sale Objections have either been resolved as stated on the record at the Sale Hearing, or they have been overrruled for the reasons stated by the Court on the record at the Sale Hearing.

Based on the foregoing, the entire record before the Court, and for good cause appearing,

IT IS HEREBY ORDERED as follows:

1. The Sale Motion shall be, and hereby is, approved as provided herein. To the extent that any of the Sale Objections, or any other objection to the Sale Motion, has not been withdrawn or resolved under the terms of this Order, any such objection shall be, and hereby is,

QB\34305063.7
Case 2:15-bk-00679-BKM    Doc 316    Filed 03/27/15    Entered 03/27/15 14:29:50    Desc
Main Document    Page 6 of 60

overruled. Without limiting the foregoing, the C&A Purchase Agreement and the transactions contemplated thereby are hereby approved in all respects.

2.    The terms and conditions of the C&A Purchase Agreement are hereby approved and the sale of the Purchased Assets is authorized under Bankruptcy Code §363(b). SkyMall is hereby authorized to effectuate the terms of the C&A Purchase Agreement, together with any non-material modifications to the C&A Purchase Agreement as may be mutually agreed to in writing by SkyMall and C&A.

3.    Pursuant to Bankruptcy Code §363(f), and subject only to Permitted Encumbrances (if any) as stated in the C&A Purchase Agreement, the sale of the Purchased Assets to C&A shall be free and clear of all claims, liens, encumbrances, and other interests of any kind. C&A shall not be liable in any way (as a successor entity or otherwise) for any claims or liens that any creditor or other third party may have against the Debtors or the Purchased Assets, except only with respect to the Permitted Encumbrances as expressly provided in the C&A Purchase Agreement. All creditors and any other third parties are hereby permanently enjoined from asserting or prosecuting any claims or liens against C&A, C&A's affiliates, the Purchased Assets, or C&A's ownership, use or operation of the Purchased Assets. All persons and entities are prohibited and enjoined from taking any action to prevent, adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to transfer the Purchased Assets to C&A in accordance with the C&A Purchase Agreement and this Order. As stated in the C&A Purchase Agreement, the Purchased Assets do not include the Debtors' books and records, the Debtors will continue to have custody and control of their books and records after the Closing, and C&A will have access rights as provided in the C&A Purchase Agreement.

4.    Except as otherwise expressly provided in the C&A Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants and other

creditors holding Claims against the Debtors or the Purchased Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Debtors' predecessors or affiliates, the Purchased Assets, the ownership, sale or operation of the Purchased Assets and the Debtors' business prior to Closing or the transfer of the Purchased Assets to C&A, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against C&A, its successors or assigns, their property or the Purchased Assets. Following the Closing, no holder of any Claim shall interfere with C&A's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim, or based on any action the Debtors may take in the Debtors' Chapter 11 cases. If any person or entity that has filed financing statements, mechanic's Claims, or other documents or agreements evidencing Claims against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the transactions contemplated by the C&A Purchase Agreement, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims (other than Permitted Encumbrances and Assumed Liabilities) that the person or entity has with respect to the Purchased Assets, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity (with respect to the Purchased Assets only); (b) C&A is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all such Claims against C&A and the applicable Purchased Assets; and (c) C&A may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction and releases of all such Claims with respect to the Purchased Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Purchased Assets free and clear of Claims shall be self-executing, and none of the Debtors nor C&A shall be required to execute or file releases,

-8-

termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

5.    To the maximum extent permitted under applicable law, C&A shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of SkyMall with respect to the Purchased Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to C&A as of the Closing Date.  No governmental unit (as defined in section 101(27) of the Bankruptcy Code) or any Representative thereof may deny, revoke, suspend or refuse to renew any permit, license or similar grant relating to the operation of the Purchased Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions under the C&A Purchase Agreement to the extent that any such action by a governmental unit or any Representative thereof would violate section 525 of the Bankruptcy Code.

6.    C&A shall not be deemed, as a result of any action taken in connection with the C&A Purchase Agreement, the consummation of the transactions contemplated by the C&A Purchase Agreement, or the transfer or operation of the Purchased Assets to (a) be a legal successor, or otherwise be deemed a successor to SkyMall or any other Debtor; (b) have, de facto or otherwise, merged with or into SkyMall or any other Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of SkyMall, any other Debtor or the enterprise(s) of SkyMall or any other Debtor, including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), WARN (defined below), CERCLA (defined below), the Fair Labor Standard Act, Title VII of the Civil Case 15-10197-KJC Doc 36-4 Filed 02/05/15 Page 21 of 31 -21- DLI-266512068v3 #32440710 v1 Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act, 29 U.S.C. §

151, et seq. (the "NLRA"), environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including, without limitation, filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

7. Other than as expressly set forth in the C&A Purchase Agreement with respect to Permitted Encumbrances and Assumed Liabilities, C&A shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Purchased Assets or (b) any Claims against the Debtors or any of their predecessors or affiliates. C&A shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described herein, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing. C&A shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) ("WARN") or the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any foreign, federal, state or local labor, employment, or environmental law whether of similar import or otherwise by virtue of C&A's purchase of the Purchased Assets or assumption of the Assumed Liabilities

8. Nothing in this Order or the C&A Purchase Agreement shall require C&A to (a) continue or maintain in effect, or assume any liability in respect of any employee, collective bargaining agreement, pension, welfare, fringe benefit or any other benefit plan, trust arrangement or other agreements to which the Debtors are a party or have any responsibility therefor including, without limitation, medical, welfare and pension benefits payable after retirement or other termination of employment; or (b) assume any responsibility as a fiduciary, plan sponsor or otherwise, for making any contribution to, or in respect of the funding, investment or administration of any employee benefit plan, arrangement or agreement (including but not limited to pension plans) or the termination of any such plan, arrangement or agreement.

9. Effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any matter any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against C&A, or its assets (including the Purchased Assets), with respect to any (a) Claim (other than a Permitted Encumbrance or Assumed Liability) or (b) Successor or Transferee Liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance; (iv) asserting any setoff, right of subrogation or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

10. Pursuant to Bankruptcy Code §363(f) and except as expressly provided otherwise in the C&A Purchase Agreement and this Order, the Purchased Assets shall be transferred to C&A at closing under the C&A Purchase Agreement free and clear of all claims, liens (including,

-11-

without limitation, any statutory lien on real or personal property and any and all "liens" as that term is defined and used in the Bankruptcy Code, including section 101(37) thereof), liabilities, interests, rights and encumbrances, including, without limitation, the following: all mortgages, restrictions (including, without limitation, any restriction on the use, voting rights, transfer rights, claims for receipt of income or other exercise of any attributes of ownership), hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, equity interests, conditional sale rights or other title retention agreements, pledges, judgments, demands, rights of first refusal, consent rights, offsets, contract rights, rights of setoff, recoupment rights, rights of recovery, reimbursement rights, contribution claims, indemnity rights, exoneration rights, product liability claims, alter-ego claims, environmental rights and claims (including, without limitation, toxic tort claims), labor rights and claims, employment rights and claims, pension rights and claims, tax claims, regulatory violations by any governmental entity, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising from holders of merchandise, store or gift credits, customers of the Debtors who wish to return, or assert Claims based on, items purchased from or through any of the Debtors, or debts arising in any way in connection with any agreements, acts, or failures to act, reclamation rights or claims, obligation claims, demands, guaranties, option rights or claims, rights, contractual or other commitment rights and claims, rights of licensees or sublicensees (if any) under section 365(n) of the Bankruptcy Code or any similar statute, rights of tenants and subtenants (if any) under section 365(h) of the Bankruptcy Code or any similar statute, and all other matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 cases (but, for the avoidance of doubt, in each case arising from the ownership of the Purchased Assets or the operation of the Business

prior to the Closing Date), and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under any theory, law or doctrine of successor liability or related theories (all of the foregoing collectively being referred to in this Order as "Claims", and, as used in this Order, the term "Claims" includes, without limitation, any and all "claims" as that term is defined and used in the Bankruptcy Code, including section 101(5) thereof), with all such Claims to attach to the proceeds of the sale to be received by SkyMall with the same validity, force, priority and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the sale (collectively, the "**Removed Encumbrances**"). All Removed Encumbrances (if any) shall attach, solely and exclusively, to the proceeds of the sale in the order of their priority, with the same validity, force and effect which they now have against the Purchased Assets, subject to any and all claims and defenses the Debtors may possess with respect thereto.

11. At Closing, all of SkyMall's right, title and interest in and to, and possession of, the Purchased Assets shall be immediately vested in C&A pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code free and clear of any and all Claims, except for Permitted Encumbrances and Assumed Liabilities. Such transfer shall constitute a legal, valid, binding and effective transfer of, and shall vest C&A with good and marketable title to, the Purchased Assets. Other than as expressly described in the C&A Purchase Agreement and this Order, all person or entities, presently or on or after the Closing, in possession of some or all of the Purchased Assets are directed to surrender possession of such Purchased Assets to C&A or its designee on the Closing or at such time thereafter as C&A may request.

12. C&A is hereby adjudicated to be a good-faith purchaser and is hereby granted and is entitled to all of the protections provided to a good-faith purchaser under Bankruptcy Code §363(m).

1         13.     SkyMall is hereby authorized, directed and empowered: (a) to carry out all of the

2 provisions of the C&A Purchase Agreement and other related agreements, and all non-material

3 modifications thereto as may be agreed to in writing by SkyMall and C&A; (b) to execute,

4 deliver, file and record, as appropriate, the documents evidencing and consummating the C&A

5 Purchase Agreement and other related agreements; (c) to take any and all actions contemplated by

6 the C&A Purchase Agreement, other related agreements and this Order; and (d) to perform such

7 other acts and execute and deliver such other documents as are consistent with and necessary or

8 appropriate to implement, effectuate and consummate the C&A Purchase Agreement and other

9 related agreements, including making any non-material modifications, amendments or corrections

10 of those agreements agreed to in writing by SkyMall and C&A, all without further application to,

11 or order of, the Court.

12         14.     This Order is and shall be binding upon and govern the acts of all entities,

13 including, without limitation, all filing agents, filing officers, title agents, title companies,

14 recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or

15 other intellectual property, administrative agencies, governmental departments, secretaries of

16 state, federal and local officials and all other persons and entities who may be required by

17 operation of law, the duties of their office or contract, to accept, file, register or otherwise record

18 or release any documents or instruments; and each of the foregoing persons and entities is hereby

19 authorized and directed to accept for filing any and all of the documents and instruments

20 necessary and appropriate to consummate the transactions contemplated by the C&A Purchase

21 Agreement.

22         15.     The C&A Purchase Agreement and all other documents, agreements and

23 instruments necessary to effectuate and consummate the transactions contemplated by the C&A

24 Purchase Agreement, together with the terms and provisions of this Order, shall be binding in all

25 respects upon, and shall inure to the benefit of the Debtors, C&A and their respective successors

26

-14-

and assigns, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code, and shall not be subject to rejection.

16.     In the event that the sale of the Purchased Assets to C&A pursuant to the C&A Purchase Agreement and this Order fails to close because of a breach by C&A or other failure by C&A to perform its obligations under the C&A Purchase Agreement or this Order (including, without limitation, a failure of C&A to close on or before the "Outside Date" as defined in the C&A Purchase Agreement), the Debtors are authorized, without the need to obtain further order of this Court, to substitute FSG for "C&A" as the buyer under this Order as follows:

a.     FSG will be obligated to proceed as buyer pursuant to the terms of the FSG bid stated on the record at the Auction (the "**FSG Bid**"). Without limiting the foregoing, the primary economic terms of the FSG Bid are summarized as follows: (i) total purchase price of two million five hundred thousand dollars ($2,500,000); (ii) one million dollars ($1,000,000) of the purchase price payable in full and in readlily available funds at closing; (iii) one million five hundred thousand dollars ($1,500,000) of the purchase price paid through a promissory note from FSG (or its designee); (iv) the promissory note made by FSG entity that is the purchaser; (v) promissory note has a non-default interest rate of six percent (6%) per annum, with interest payable monthly; (vi) promissory note secured by a lien on all acquired assets; and (vii) the full principal and all other unpaid amounts under the promissory note are due and payable in full on March 15, 2017.

b.     FSG to purchase the Purchased Assets in accordance with the terms of a final APA based on the FSG Bid, in form, content and detail acceptable to the Debtors, which will be filed with the Court prior to closing of a sale to FSG.

c.     All terms of this Order are binding on, and inure to the benefit of, FSG.

QB\34205016.7
Case 2:15-bk-00679-BKM    Doc 316    Filed 03/27/15    Entered 03/27/15 14:29:50    Desc
Main Document    Page 15 of 60

17.     Notwithstanding anything to the contrary in this Order or the C&A Purchase Agreement, (a) the sale of the Purchased Assets to C&A is expressly subject to Connexions' rights and interests pursuant to the following documents entered into between Connexions and SkyMall in connection with the Ventures Sale: (i) the Transition Services Agreement, dated as of September 8, 2014, by and between Connexions and SkyMall (as it may have been amended on or before the date of this Order, the "**TSA**"), and (ii) the Trademark License Agreement, dated as of September 8, 2014, by and between Ventures and SkyMall (as it may have been amended on or before the date of this Order, the "**License Agreement**"); (b) at least until June 30, 2015, C&A shall provide SkyMall and/or Connexions with reasonable access to the Purchased Assets, if and to the extent necessary, in order to allow SkyMall to continue to perform under the License Agreement and the Amended TSA (defined below) (and pending the entry of an Order regarding a motion for approval of the Amended TSA, the TSA); (c) the Debtors shall not seek to terminate or reject the Amended TSA (or pending the entry of an Order regarding a motion for approval of the Amended TSA, the TSA) or the License Agreement prior to June 30, 2015; (d) subject to the compliance of C&A and the Debtors with the preceding clauses (b) and (c), the License Agreement shall terminate on June 30, 2015, and (e) the Debtors shall enter into, and seek court approval of, an Amended TSA (the "**Amended TSA**") acceptable in form and substance to the Debtors and Connexions, substantially in the form that has been negotiated by the Debtors and Connexions prior to the date of this Order, pursuant to which, among other things, Connexions and the Debtors shall agree to the matters described in clauses (c) and (d) above.

18.     This Court shall retain exclusive jurisdiction to: (a) interpret and enforce the provisions of the C&A Purchase Agreement and this Order in all respects: and (b) hear, determine and resolve any and all matters arising from the construction or implementation of the C&A Purchase Agreement and this Order (including, without limitation, matters pertaining to the FSG Bid as the Backup Bid).

-16-

19.     Nothing contained in any chapter 11 plan confirmed in any of the Bankruptcy Cases, any order confirming any such chapter 11 plan or any order approving wind-down or dismissal of the Bankruptcy Cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of the C&A Purchase Agreement or this Order, and to the extent of any conflict or derogation between this Order or the C&A Purchase Agreement and such future plan or order, the terms of this Order and the C&A Purchase Agreement shall control.  To the extent any provisions of this Order conflict with, or are otherwise inconsistent with, the terms and conditions of the C&A Purchase Agreement or the Bidding Procedures Order, this Order shall govern and control.

20.     Notwithstanding any applicability of Bankruptcy Rules 6004 and 6006 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

**DATED AND SIGNED AS INDICATED ABOVE.**

**AGREED AS TO FORM AND CONTENT BY:**

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391

By _____
    John A. Harris

Counsel for Debtors and Debtors-In-Possession

COOLEY LLP
1114 Avenue of the Americas
New York, NY 10036

By _____
    Jeffrey L. Cohen
    Seth Van Aalten
    Alex R. Velinsky

Lead Counsel for the Official Committee of Unsecured Creditors

PERKINS COIE LLP
2901 North Central Avenue
Suite 2000
Phoenix, AZ 85012-2788

By _____
    Jordan Kroop

Counsel for C&A

**AGREED AS TO FORM AND CONTENT BY:**

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391

By _____
        John A. Harris

Counsel for Debtors and Debtors-In-Possession

COOLEY LLP
1114 Avenue of the Americas
New York, NY 10036

By _____
        Jeffrey L. Cohen
        Seth Van Aalten
        Alex R. Velinsky

Lead Counsel for the Official Committee of Unsecured Creditors

PERKINS COIE LLP
2901 North Central Avenue
Suite 2000
Phoenix, AZ 85012-2788

By _____
        Jordan Kroop

Counsel for C&A

-18-

# Exhibit "1"

**ASSET PURCHASE AGREEMENT**

**Between**

**SkyMall Holdings LLC**

**as Buyer**

**and**

**SkyMall, LLC,**

**as Seller**

**Dated as of _____, 2015**

## TABLE OF CONTENTS

**To Be Inserted**

QB\34219641.3

**<u>Schedules</u>**

**[To Be Finalized]**

Schedule 2.1(d)        Acquired Intellectual Property

Schedule 2.3          Certain Excluded Assets

Schedule 3.3          Allocation of Purchase Price

Schedule 5.4          Litigation

Schedule 5.5          Permitted Liens and Exceptions

QB\34219641.3

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is dated as of _____, 2015, by and between SkyMall Holdings LLC, a New Jersey limited liability company ("Buyer") and SkyMall, LLC, a Delaware limited liability company ("Seller"). Seller and Buyer are individually referred to herein as a "Party", and collectively they are referred to as the "Parties". Capitalized terms are defined in Section 1.1 below.

WHEREAS, Seller operates an eCommerce business (the "Business");

WHEREAS, Seller has filed with the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court") a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, §§ 101-1532 (as amended, the "Bankruptcy Code"), Case No. 2:15-bk-00679-BKM (the "Chapter 11 Case"). Seller's Chapter 11 Case is being jointly-administered with Chapter 11 cases filed by certain affiliates of Seller;

WHEREAS, Seller intends to sell certain of its assets used or usable in connection with the Business, through a sale or sales facilitated by Seller's investment banker, CohnReznick Capital Markets Securities, LLC ("CohnReznick Capital"), which will be subject to approval of the Bankruptcy Court in the Chapter 11 Case;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, upon the terms and subject to the conditions set forth in this Agreement and in accordance with Sections 105, 363, 365 and other provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, the Purchased Assets in exchange for the payment to Seller of the Purchase Price and the assumption by Buyer of the Assumed Liabilities;

WHEREAS, the Purchased Assets are assets of Seller, which will be sold, assigned, transferred, conveyed and delivered at the Closing by Seller to Buyer free and clear of all claims, liens, encumbrances, and other interests (other than Permitted Liens and Exceptions) pursuant to the Sale Order; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order to be entered in the Chapter 11 Case pursuant Section 363(f) and other applicable provisions of the Bankruptcy Code;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1**   Definition of Terms.   The terms defined in this Section 1.1, whenever used in this Agreement, shall have the respective meanings indicated below.

"Accounts Receivable" shall have the meaning ascribed to such term in Section 2.1(d).

"Acquired Customer Lists" shall have the meaning ascribed to such term in Section 2.1(n).

"Acquired Intellectual Property" shall have the meaning ascribed to such term in Section 2.1(e).

"Acquired Inventory" shall have the meaning ascribed to such term in Section 2.1(c).

"Acquired Permits" shall have the meaning ascribed to such term in Section 2.1(b).

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning set forth in the preamble above, and includes all Exhibits and Schedules hereto.

"Allocation Schedule" has the meaning set forth in Section 3.3.

"Applicable Law" means all applicable (i) foreign, federal, state and local laws, statutes, rules, regulations, codes and ordinances, (ii) Governmental Approvals, and (iii) orders, decisions, injunctions, judgments, awards and decrees of any Governmental Authority.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Avoidance Actions" means any and all causes of action of Seller pursuant to Sections 544, 545, 547, 548, 549, and 553(b) of the Bankruptcy Code and all proceeds therefrom.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court on January 29, 2015 in the Chapter 11 Case approving the procedures by which the sale of the Purchased Assets shall be conducted, as may be amended from time to time.

"Bill of Sale and Assumption and Assignment Agreement" has the meaning set forth in Section 4.2.

"Business" has the meaning set forth in the Recitals.

"Business Days" means any day other than Saturday, Sunday or a day on which banking institutions in Arizona are authorized or obligated by law or regulation to be closed.

"Buyer" has the meaning set forth in the Recitals.

"C&A Marketing" means C&A Marketing, Inc., a New Jersey corporation.

"Chapter 11 Case" has the meaning set forth in the Recitals.

"Claim" has the meaning given that term in the Sale Order.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1(a).

"Closing Time" has the meaning set forth in Section 4.1(a).

"CohnReznick Capital" has the meaning set forth in the Recitals.

"Consent" means any consent, approval, authorization, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing by or with, or report or notice to, any Person.

"Contracts" shall mean all oral or written contracts to which Seller is a party that are used or useful in the conduct of the Business, including all agreements for the sale, purchase, lease, and/or use of goods or services.

"Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of securities, partnership or other ownership interests, by contract or credit arrangement, as trustee or executor, or otherwise.

"Copyrights" shall have the meaning ascribed to it in the definition of the term Intellectual Property.

"Customer Lists" means all lists of customers, vendors, suppliers or other parties owned and maintained by Seller and used in Seller's business, with all such lists subject to the privacy policies of Seller relating to the information in such lists in effect as of the Petition Date.

"Deposit" means a deposit in the amount of One Hundred And Fifty Thousand and no/100 Dollars ($150,000) payable to Seller's Designee (or otherwise held in a manner acceptable to Seller in its sole discretion) submitted by Buyer upon execution and delivery of this Agreement plus such additional amount, if any, as shall be required to be delivered by Buyer in accordance with the terms of Section 3.2.

"Equipment" shall have the meaning ascribed to such term in Section 2.1(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" has the meaning set forth in Section 2.2(i).

"Excluded Contract" means all Contracts except for the Assumed Contracts.

"Excluded Customer Lists" has the meaning set forth in Section 2.2(q).

"Excluded Equipment" has the meaning set forth in Section 2.2(d).

"Excluded Intellectual Property" has the meaning set forth in Section 2.2(p).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Permits" has the meaning set forth in Section 2.2(f).

"Final Order" means an Order of the Bankruptcy Court or a court of competent jurisdiction, as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Bankruptcy Court or court of competent jurisdiction and the time for filing any such petition or protest is passed; (iii) the Bankruptcy Court or court of competent jurisdiction does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; (iv) other than with respect to the Sale Order, the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; and (v) with respect to the Sale Order, the action or order is not then under judicial review for a challenge regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, there is no notice of appeal or other application for judicial review pending regarding Buyer's status as a purchaser in good faith pursuant to Section 363(m) of the Bankruptcy Code, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Governmental Approval" means any Consent of any Governmental Authority.

"Governmental Authority" means any federal, state, local, domestic, foreign or supranational governmental, regulatory, or self-regulatory authority, agency, court, tribunal, commission or other governmental, regulatory or self-regulatory entity, or any other political subdivision thereof, or any agency or instrumentality of any such governmental or political subdivision, or any other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Insurance Policies" means those policies of insurance maintained by or for the benefit of Seller, and all claims, returned premiums and other proceeds under or from such insurance policies.

"Intellectual Property" means all intellectual property rights owned or licensed by Seller in connection with the Business and arising from or in respect of the following: (i) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, all applications, registrations and renewals thereof, and material unregistered trademarks (collectively, "Trademarks"), (ii) copyrights and registrations and applications therefor, works of authorship, and mask work rights and, material unregistered copyrights, in each case used primarily in connection with the Business, (collectively, "Copyrights"), (iii) all Software and Technology of Seller used in connection with the Business, and (iv) inventions, whether patentable or unpatentable and whether or not reduced to practice (to the extent any protectable right exists in any such invention not reduced to practice), and all improvements in existence at the Closing relating to the inventions, (v) trade secrets and

4

confidential business information, including, without limitation, ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, databases, customer lists and contact information, supplier lists, and business and marketing plans and proposals; and (vi) other proprietary rights and copies and tangible expressions thereof.

"Inventory" means all merchandise or other goods owned by Seller and which are held, or intended for sale at wholesale or retail.

"IRC" means the Internal Revenue Code of 1986, as amended.

"Knowledge of Seller" (and words or phrases of similar import) means the actual knowledge of Scott Wiley, Seller's acting CEO and of Seller's outside accountants and professional advisors.

"Lien" means any mortgage, pledge, hypothecation, security interest, encumbrance, lease, sublease, license, occupancy agreement, easement, encroachment, title defect, title retention agreement or lien.

"Material Adverse Effect" means a state of facts, event, change or effect to the Business, that results in a material adverse effect on the Business, taken as a whole, but excludes any state of facts, event, change or effect caused by states of facts, events, changes or developments relating to (i) changes or conditions affecting the industry in general; (ii) changes in economic, regulatory or political conditions generally; (iii) any act(s) of war or of terrorism; or (iv) changes resulting from any motion, application, proceeding or order filed relating to, the Chapter 11 Case.

"Notice" has the meaning set forth in Section 12.5.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation or award of the Bankruptcy Court or other Governmental Authority.

"Outside Date" has the meaning set forth in Section 4.1(a).

"Party" and "Parties" have the meanings set forth in the preamble above.

"Permits" shall have the meaning ascribed to such term in Section 2.1(e).

"Permitted Liens and Exceptions" means, collectively: (i) Liens and exceptions for taxes and other governmental charges and assessments (including special assessments) that are not yet due and payable; (ii) other Liens or imperfections of title that do not materially detract from the value of or materially impair the use of the Purchased Assets for their intended purpose; (iii) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect relating to the Purchased Assets; (iv) violations of laws, regulations, ordinances, orders or requirements, if any, arising out of the adoption, promulgation, repeal, modification or reinterpretation of any law, rule, regulation, ordinance or order of any federal, state, county or local government, governmental agency, court, commission, department or other such entity which occurs subsequent to the Closing Date; (v) Liens, title exceptions or imperfections of title caused by or resulting from the acts of Buyer or any of its Affiliates, employees, officers, directors,

5

agents, contractors, invitees or licensees; and (vi) encroachments, protrusions, overlaps, boundary line disputes, rights-of-way, street line changes and any other matters which would be disclosed by an accurate survey and inspection of the Purchased Assets and that do not materially detract from the value of or materially impair the use of the Purchased Assets for their intended purpose. **[Additional language to address Connexions will be added to Sale Order.]**

"Person" means any natural person, firm, partnership, association, corporation, company, limited liability company, trust, business trust, Governmental Authority or other entity.

"Personal Guaranty" means the personal guaranty(ies) in favor of Seller by each of Chaim Piekarski and Akiva Klein, in form, content, and detail acceptable to Seller, guaranteeing the full payment and performance of the Promissory Note and all amounts owing thereunder.

"Petition Date" means January 22, 2015, the date of commencement of the Chapter 11 Case.

"Promissory Note" means the promissory note to be made by Buyer and C&A and payable to Seller, which shall be in form, content, and detail acceptable to Seller, and which will include the following economic terms: (a) an original principal amount of Nine Hundred Thousand and no/100 Dollars ($900,000.00); (b) a non-default interest rate of Six Percent (6%) per annum; (c) principal amortization payments in the amount of $150,000 due and payable on each of June 15, 2015, September 15, 2015, December 15, 2015, and March 15, 2016; (d) principal amortization payments in the amount of $75,000 due and payable on each of June 15, 2016, September 15, 2016, December 15, 2016, and March 15, 2017; and (e) all unpaid amounts under the note shall be due and payable in full on March 15, 2017.;/

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Representatives" with respect to a Party, means such Party's directors, officers, employees, accountants, counsel, consultants, lenders and agents.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court for purposes of approving and confirming the sale of the Purchased Assets in accordance with the Bidding Procedures Order.

"Sale Order" means an order of the Bankruptcy Court, in form, content, and detail reasonably acceptable to Seller, and in form and substance similar in all material respects to the draft order attached as Exhibit [__] to this Agreement, approving this Agreement and the consummation of the transactions contemplated hereby, including the assumption and assignment of the Assumed Contracts.

"Seller" has the meaning set forth in the preamble above.

"Seller's Designee" means the person(s) or entity(ies) designated by Seller to handle activities regarding the Closing and other matters as described in this Agreement.

6

"Software" means, except to the extent generally available for purchase from a third Person, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data, collections of data, whether machine readable or otherwise, (iii) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Taxes" means any federal, state, provincial, local or foreign income, alternative, minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty or other governmental charge or assessment or deficiencies thereof, and including any interest or penalties thereon or additions thereto.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business, other than any in the form of Software.

"Trademarks" shall have the meaning ascribed to such term in the definition of Intellectual Property. Without limitation, such "Trademarks" include the designations "SkyMall" and all variants thereof and composite marks formed therefrom, and all trademarks, service marks and trade names and the registrations and applications therefor listed on Schedule 2.1(k).

"Transaction Taxes" has the meaning set forth in Section 8.1.

"UCC" means the Uniform Commercial Code as the same may, from to time, be in effect in the State of Arizona.

"Website" shall mean (i) the website currently located at the URL http://www.skymall.com, (ii) all other websites owned or controlled by Seller (listed on Schedule [   ], and all Content and pages contained within each of those websites, hosted anywhere in the world, including Seller's business sites located or associated with other site hosts, such as Instagram, Facebook, Twitter, etc. and (iii) all website user information and data collected by Seller, including email addresses,

website logs, clickstream data and cookies, but, in each case, excluding freely available graphic or text content, such as clip art or graphic images licensed from commercial media vendors. For each Website, the Content and pages shall include all computer files, login and password data, (including such as are necessary for administrative control), and documentation for the current version of the Website and all archived Content and pages in Seller's possession or control. As used herein, the term "Content" means any literary, audio, video, and other information, including editorial content, data, animation, graphics, photographs and artwork, and combinations of any or all of the foregoing, in any tangible or digital formats.

**Section 1.2**     <u>Construction</u>

The Parties acknowledge that they and their counsel have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, no rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall be employed in the interpretation hereof, and this Agreement or any amendment hereof shall be construed as if drafted jointly by the Parties. Any references to any agreement defined herein shall be deemed to include reference to any amendment, restatement or other modification made thereto in accordance with the terms thereof. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Words (including capitalized terms defined herein) in the singular shall be held to include the plural and <u>vice</u> <u>versa</u> as the context requires. All references herein to a "Section", "Article", "Exhibit" or "Schedule" are to a respective section, article, exhibit or schedule of or to this Agreement, unless otherwise specified. The words "herein", "hereinafter", "hereunder" and words of similar import used in this Agreement shall, unless otherwise stated, refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to "$" in this Agreement and the other agreements contemplated hereby shall refer to United States dollars (unless otherwise specified expressly). References to any gender also are intended to include any other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation."

**ARTICLE II**
**SALE AND PURCHASE OF ASSETS**

**Section 2.1**     <u>Purchased Assets; Access to Books and Records</u>

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Seller shall sell, assign, convey, deliver and otherwise transfer, or cause to be sold, assigned, conveyed, delivered and otherwise transferred, to Buyer, and Buyer shall purchase and accept from Seller all right, title and interest of Seller in and to all the assets relating to the Business described below in this Section, whether now existing or hereafter acquired, owned by Seller on the Closing Date (other than the Excluded Assets) (collectively, the "<u>Purchased Assets</u>"). (Buyer may elect before the Closing not to including any asset in the Purchase Assets, and any such assets will not be transferred to Buyer at the Closing, <u>provided that</u> any such election by Buyer shall not reduce or otherwise affect the Purchase Price or any other terms of this Agreement.)

(a)     all licenses, permits, franchises and other authorizations of any Governmental Authority relating to the Purchased Assets, and all pending applications therefor (collectively, the "Permits"), but specifically excluding any Excluded Permits (the "Acquired Permits"), to the full extent, if any, that such Acquired Permits are transferable or assignable;

(b)     all Inventory of Seller as of the Closing Date, wherever located, whether in the possession of Seller, in transit, in storage, or in the possession of any third parties and all warranties, licenses, releases and agreements, if any, express or implied, existing for the benefit of Seller in connection therewith, but specifically excluding any Excluded Inventory (the "Acquired Inventory");

(c)     all furniture, equipment, supplies and other tangible personal property owned by Seller, other than Excluded Equipment, together with all warranties, licenses, releases, service agreements and contractual commitments, if any, express or implied, existing for the benefit of Seller in connection therewith or for operation of the Seller's business (collectively, the "Acquired Equipment");

(d)     all accounts receivable of Seller and all other "Accounts" (as defined in the UCC) of Seller ("Accounts Receivable") generated in the ordinary course of Seller's business as of the Closing Date, but specifically excluding Avoidance Actions, Excluded Claims and other Excluded Assets described herein and any amounts that represent sales taxes, use taxes or similar taxes that must be remitted by Seller to any taxing authority.

(e)     the Intellectual Property and licenses, including any listed on Schedule 2.1(i) and any accrued claims or causes of action to enforce or protect any such Intellectual Property, but specifically excluding the Excluded Intellectual Property (the "Acquired Intellectual Property");

(f)     Telephone numbers, the Website, email addresses and listings;

(g)     any and all of Seller's advertising materials and related designs, patterns, drawings and specifications, pricing and cost documentation, and marketing materials, including historical or archival materials held by Seller in inventory;

(h)     the Customer Lists (subject to the privacy policies of Seller relating to the information in such lists in effect as of the Petition Date), and all rights and liabilities relating to the Customer Lists (the "Acquired Customer Lists"), but specifically excluding the Excluded Customer Lists;

(i)     to the extent assignable or transferrable, all rights of Seller under all warranties (expressed or implied), representations, indemnities, or guaranties made by third parties to or for the benefit of Seller with respect to the Purchased Assets;

(j)     all goodwill related to the foregoing.

In addition, Seller shall provide to Buyer and Buyer shall have the right to reasonable access to copies or originals of all books, records, files or papers of Seller, whether in hard copy or electronic format, relating to the Purchased Assets or to the on-going operation of the Business, including, sales and promotional literature, manuals and data, sales and purchase correspondence,

9

vendor lists, mailing lists, catalogues, research material, URLs, know-how, specifications, designs, drawings, processes and quality control data, if any, or any other intangible property and applications for the same, engineering information, test results, plans, personnel and employment records (other than records with respect to former employees or employees who do not become employees of Buyer as of or after the Closing Time), technical information, diagrams, maintenance schedules, operating and production records, safety and environmental reports, data, studies and documents, fixed asset ledgers, Tax Returns (other than income Tax Returns) regarding real property, personal property and *ad valorem* taxes with respect to the Purchased Assets, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns. For the avoidance of doubt, the books and records of Seller are not included in the Purchased Assets, but the access right described in the immediately preceding paragraph shall be deemed a critical component of the transactions contemplated hereby and the Seller (and any successor thereto) shall cooperate with Buyer, at Buyer's request and expense, to create duplicate copies of such books and records for Buyer's purposes, and under no circumstance shall Buyer be restricted (including restrictions on its disclosure of information contained therein) from its use of such books and records in any manner whatsoever.

**Section 2.2**    Excluded Assets

Notwithstanding anything to the contrary herein, Buyer will not purchase and accept, and Seller will not sell, assign, convey, deliver or otherwise transfer, any of Seller's right, title and interest in or to any of the following assets (collectively, the "Excluded Assets"):

(a)    all cash and cash equivalents as of the Closing Date (including credit card receivables and checks received prior to the Closing, whether or not deposited or cleared prior to the Closing);

(b)    all land, real property, real property improvements, real property fixtures and appurtenances, and real property leasehold and other real property interests;

(c)    all of Seller's books and records;

(d)    all furniture and equipment deemed by Seller to be necessary: (i) to preserve, access and maintain all of Seller's and Seller's affiliates' books and records, including without limitation the information and records of Seller and Seller's affiliates subject to the Subpoena issued by the Securities & Exchange Commission to Seller and/or Seller's affiliates; and (ii) to perform the services and provide the access contemplated by the Transition Services Agreement described below (collectively, the "Excluded Equipment"). For the avoidance of doubt, the equipment deemed necessary for the purposes described in the foregoing clauses (i) and (ii) shall include without limitation (x) all computers, computer servers, back-up systems and other electronic data storage and retrieval systems and devices, computer networking equipment and all associated software, programs and licenses for the same, (y) physical records storage furnishings, equipment and systems and (z) telephone, Internet and other communications equipment and related software, programs and licenses for the same;

(e)    all Contracts other than the Acquired Intellectual Property;

(f)    **[all Permits set forth on Schedule 2.2 ("Excluded Permits");]**

(g)     all of Seller's bank accounts, lockboxes, marketable or other securities, commercial paper, certificates of deposit and other bank deposits and treasury bills;

(h)     all Insurance Policies, including all proceeds thereof and claims in connection therewith;

(i)     all Avoidance Actions and all Claims arising prior to the Closing Date (collectively, the "Excluded Claims"), including, without limitation, all Claims which Seller may have against (i) any of Seller's Affiliates in respect of intercompany transfers, receivables, guarantees or indemnities, (ii) any Person to the extent related to any Excluded Assets (whether arising before or after the Closing Date), and (iii) any Person (including Governmental Authorities) for refund or credit of any type with respect to any Taxes paid or accrued with respect to periods ending on or prior to the Closing Time;

(j)     all escrowed funds, security deposits, prepaid deposits or reserves with any vendor, utility or other third party, including, without limitation, funds held in escrow pursuant to that certain Indemnity Escrow Agreement dated as of September 8, 2014 between Seller and Connexions Loyalty, Inc. ("Connexions");

(k)     all receivables, rights and Claims from or against Connexions and/or SkyMall Ventures, LLC ("Ventures") relating to: (i) the Membership Interest Purchase Agreement dated as of September 8, 2014 by and among Seller, Connexions and Ventures (the "Ventures Purchase Agreement"); and (ii) the Transition Services Agreement dated as of September 8, 2014 by and between Seller and Connexions, as amended from time to time ("Transition Services Agreement");

(l)     all personnel records and other records that Seller is required to retain in its possession pursuant to any Applicable Law or is not permitted under Applicable Law to provide to Buyer or that do not exclusively relate to the Business;

(m)     all rights of Seller under this Agreement or any agreement executed in connection with or relating to this Agreement;

(n)     the company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller;

(o)     Seller's directors and officers liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other employee benefits plan of any kind;

(p)     **all Intellectual Property that is specifically identified on Schedule 2.2 or that is described in Section 2.2(d) (the "Excluded Intellectual Property");]**

(q)     **[all Customer Lists that are specifically identified on Schedule 2.2 (the "Excluded Customer Lists");]**

(r)     The rights of Ventures under the Trademark License Agreement dated as of September 8, 2014 by and between Seller and Ventures, but only for the period ending 90 days after the closing date;

(s)     The rights of Connexions under the perpetual, royalty-free, fully-paid up license to copy, modify, distribute, install, access, display and otherwise use the proprietary software developed by Seller, as described in Section 2.17(i) of the Ventures Purchase Agreement described above;

(t)     all rebates, price adjustments, adjustments to accounts payable, customer programs, discounts or promotions, and related rights to payment owed to Seller which accrued on or before the Closing Date; and

(u)     all equity interests of Seller, including any options, warrants or other securities exchangeable or convertible into equity interests of Seller.

**Section 2.3**     Assumed Liabilities

At the Closing, Buyer shall assume fully and agree to pay, perform, fulfill and discharge, and shall pay, perform, fulfill and discharge, as they become due, the following liabilities:

(a)     all Claims relating to Buyer's ownership or use of the Purchased Assets;

(b)     all Claims relating to the operation of the Business from and after the Closing (including without limitation under the Acquired Permits, the Acquired Customer Lists, and the Acquired Intellectual Property);

(c)     all Claims for rebates, price adjustments, adjustments to accounts payable, customer programs, discounts or promotions, arising from the operation of the Business from and after the Closing; and

(d)     all Claims for or in respect of Taxes assessed or payable after the Closing that are the responsibility of Buyer.  For the avoidance of doubt, Taxes incurred by Seller in the operation of the Business prior to Closing or any taxes assessed and payable prior to Closing shall not be the responsibility of Buyer.

**Section 2.4**     Excluded Liabilities

Except with respect to the Assumed Liabilities, Buyer shall not assume, or be deemed to have assumed, and Seller shall be solely and exclusively liable with respect to, all Claims against Seller including, without limitation, all Claims relating to the Excluded Assets (all such Claims other than Assumed Liabilities, the "Excluded Liabilities").

**ARTICLE III**
**PURCHASE PRICE**

**Section 3.1**     Purchase Price; Assumption of Liabilities

The Purchase Price for the Purchased Assets shall be One Million Nine Hundred Thousand and no/100 Dollars ($1,900,000.00) (the "Purchase Price").  At the Closing, (a) Buyer shall pay to Closing Agent in immediately available funds the amount of One Million and no/100 Dollars ($1,000,000.00), less the Deposit (the "Initial Payment"); (b) Buyer shall deliver the Promissory Note to Seller for the remaining Nine Hundred Thousand and no/100 Dollars ($900,000.00) and (b) Buyer shall assume all of the Assumed Liabilities.

### Section 3.2     Deposit

Upon the execution and delivery of this Agreement by Buyer to Seller, Buyer shall, pursuant to the provisions of Section 12.17 below, deposit with Closing Agent, by cashiers' check or wire transfer of immediately available funds, an amount equal to the Deposit, and (b) within three (3) Business Days after Buyer is approved as a Prevailing Bidder (as defined in the Bidding Procedures Order), Buyer shall deposit with Seller's Designee such additional sum by cashiers' check or wire transfer of immediately available funds as necessary to increase the Deposit to ten percent (10%) of the amount of prevailing bid.

### Section 3.3     Allocation of Purchase Price

Buyer shall prepare and deliver to Seller a schedule (the "Allocation Schedule") allocating the Purchase Price and the Assumed Liabilities (and all other capitalized costs) among the Purchased Assets in accordance with Section 1060 of the IRC and any corresponding requirements of any state or local tax laws as soon as practicable after the Closing Time, and in no case later than forty-five (45) days before the due date, including available extensions, for filing any Tax Returns with respect to the Allocation Schedule.  Seller will have the right to raise reasonable objections to the Allocation Schedule within fifteen (15) days after its receipt thereof, in which event Buyer and Seller will negotiate in good faith to resolve such objections.  If Buyer and Seller cannot mutually resolve Seller's reasonable objections to the Allocation Schedule within ten (10) days after Buyer's receipt of such objections, such dispute with respect to the Allocation Schedule shall be presented to an independent accounting firm reasonably acceptable to each of Buyer and Seller on the next day, for a decision that shall be rendered by such independent accounting firm within ten (10) days thereafter and shall be final and binding upon each of the parties.  The fees, costs and expenses incurred in connection by the independent accounting firm shall be shared in equal amounts by Buyer, on the one hand, and Seller, on the other.  Buyer and Seller each shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594) consistent with the Allocation Schedule, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any taxing authority or any other proceedings).

## ARTICLE IV
## CLOSING

### Section 4.1     The Closing

(a)     The closing of all of the transactions contemplated hereby (the "Closing") shall occur on a date and time to be mutually agreed upon by the Parties (the "Closing Date"), but

in but in all events on or before April [1], 2015 (the "Outside Date"), unless another time or date is agreed to in writing by each of the Parties. The Closing will be held at the offices of Quarles & Brady LLP ("Seller's Counsel"), 2 N. Central Ave., Phoenix, Arizona 85004, and to the extent feasible, the Closing will be held by overnight courier or the electronic exchange of documents in Adobe (PDF) format or by facsimile, without the principals present. The Closing shall be effective as of 12:01 a.m. (_____ time) on the Closing Date (the "Closing Time").

(b)     Upon completion of the Closing, Buyer shall own the Purchased Assets and Buyer shall have assumed and be obligated to perform and discharge, in accordance with their respective terms, the Assumed Liabilities. Thereafter, Seller shall have no further income participation or ownership interest in any of the Purchased Assets and no obligation with respect to any of the Assumed Liabilities.

**Section 4.2**     Seller's Deliveries

At the Closing, Seller shall deliver to Buyer:

(a)     a bill of sale and assumption and assignment agreement transferring ownership of all Purchased Assets and the Assumed Liabilities, duly executed by Seller and dated as of the Closing Date and in a form reasonably acceptable to Seller and Buyer (the "Bill of Sale and Assumption and Assignment Agreement");

(b)     a trademark assignment, duly executed by Seller and in a form reasonably acceptable to Seller and Buyer, including a separate trademark assignment suitable for recording with regard to each jurisdiction and each recordable right or interest, such as each trademark registration, each application to register a trademark, or each recorded or recordable license interest;

(c)     a copyright assignment, duly executed by Seller and in a form reasonably acceptable to Seller and Buyer, including a copyrights assignment covering unregistered copyrights and a separate copyright assignment suitable for recording with regard to each jurisdiction and each recordable right or interest, such as each copyright registration, each application to register a copyright, or each recorded or recordable license interest;

(d)     evidence of Seller's authority, and the authority of the person executing any documents at Closing on behalf of Seller, reasonably acceptable to Buyer, to enter into the transactions contemplated by this Agreement and the Sale Order;

(e)     originals or copies of all Assumed Contracts to the extent such are in the possession or control of Seller; and

(f)     all other documents, certifications and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

**Section 4.3**     Buyer's Deliveries

At the Closing, Buyer shall deliver:

(a)     the Closing Payment, by a wire transfer of immediately available funds to the account designated in writing by Seller's Designee;

(b)     a fully executed original copy of the Promissory Note;

(c)     a fully executed original copy of the Personal Guaranty;

(d)     the Bill of Sale and Assumption and Assignment Agreement, duly executed by Buyer,

(e)     evidence of Buyer's authority, and the authority of the person executing any documents at Closing on behalf of Buyer, reasonably acceptable to Seller, to enter into the transactions contemplated by this Agreement; and

(f)     such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

### Section 5.1     Organization and Good Standing

(a)     Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Subject to any necessary authorization or approval from the Bankruptcy Court, Seller has all requisite corporate power and authority to carry on the Business and to own and use the assets of the Business except where the failure to have such full power and authority would not have a Material Adverse Effect; and

(b)     Subject to any necessary authorization or approval from the Bankruptcy Court, Seller is duly qualified or licensed to do business and is in good standing in each of the jurisdictions in which the operation of the Business or the character of the properties owned or used by Seller in connection with the Business has made such qualification or licensing necessary except where the failure to be so qualified or licensed would not have a Material Adverse Effect.

### Section 5.2     Authorization, etc.

Subject to the Bankruptcy Court's entry of the Sale Order, Seller has the corporate power and authority to execute and deliver this Agreement, to perform fully its obligations hereunder, and to consummate the transactions contemplated hereby.  The execution and delivery by Seller of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action of Seller.  Seller has duly executed and delivered this Agreement.  Subject to the Bankruptcy Court's entry of the Sale Order, this Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

### Section 5.3     Litigation

Except for matters subject to the jurisdiction of the Bankruptcy Court, as of the date hereof there is no action, suit, proceeding pending or, to the Knowledge of Seller, threatened by or against or relating to the Business or any of the Purchased Assets, other than as set forth on <u>Schedule 5.4</u> hereto.

**Section 5.4**    <u>Title; No Liens</u>

Subject to entry of the Sale Order by the Bankruptcy Court, the Purchased Assets shall be delivered to Buyer free and clear of all Liens and Claims (i) other than Permitted Liens and Exceptions (including the Permitted Liens and Exceptions set forth on <u>Schedule 5.5</u> attached hereto), (ii) other than the rights and interests arising out of the Assumed Real Property Leases, and (iii) except for those Purchased Assets that are leased or licensed to Seller, as to which such Seller has, and at the Closing will have, valid licensed or leasehold interests.

**Section 5.5**    <u>Taxes</u>

(a)    Seller has paid (or will pay out of the Purchase Price received at Closing) all Taxes (if any) due and owing that are necessary to convey title to the Purchased Assets to Buyer as provided in this Agreement.

(b)    As of the Closing Date (and assuming payment of the Cure Amounts), there will be no Liens for Taxes upon any of the Purchased Assets other than Permitted Liens and Exceptions.

**Section 5.6**    <u>Brokers, Finders, etc</u>.

Seller has not agreed to pay any fee or commission to any agent, broker, finder, or other Person for or on account of services rendered as a broker or finder in connection with this Agreement or the transactions contemplated hereby except with respect to CohnReznick Capital, whose fees and compensation (as approved by the Bankruptcy Court) shall be paid entirely by Seller.

**Section 5.7**    <u>Disclaimer</u>

16

Except as otherwise expressly provided in this Agreement, the Purchased Assets are being sold AS IS, WHERE IS WITHOUT RECOURSE TO, REPRESENTATION BY, OR WARRANTIES BY, SELLER OF ANY KIND OR DESCRIPTION WHATSOEVER, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AND/OR REPRESENTATIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PHYSICAL CONDITION, TITLE, POSSESSION, QUIET ENJOYMENT OR THE LIKE AND WITH ALL FAULTS. Without limiting the generality of the foregoing, Seller makes no warranties, express or implied, of any kind or nature, including, but not limited to, no warranties with respect to the quality, condition, content, merchantability, or fitness for a particular purpose. In addition, to the extent any of Seller's software is included in the Purchased Assets, Seller makes no representations or warranties regarding Buyer's right to use such software, as to the performance of the software, its non-infringement or otherwise. In such circumstances, Seller recommends that Buyer contact the software manufacturer directly to resolve any such issues.

**Section 5.8**     No Other Representations or Warranties

Except for the express representations and warranties contained in this Agreement, neither Seller nor its equity holders or Representatives, nor any other Person, makes or shall be deemed to make any representation, warranty or statement of any kind or nature to Buyer regarding the Purchased Assets. Buyer shall only be entitled to rely on the representations, warranties or statements that are expressly set forth herein and Buyer will not have any right or remedy arising out of any other representation, warranty or statement. Buyer further acknowledges and agrees that any cost estimates, projections or other forecasts or predictions contained or referred to in this Agreement or in any offering or other materials that have been provided to Buyer in connection with any of the transactions contemplated hereby are not and shall not be deemed to be representations and warranties of Seller or any Representatives of Seller.

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller as follows:

**Section 6.1**     Organization and Good Standing

Buyer is a [corporation] duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, and has full corporate power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

**Section 6.2**     Authorization, etc.

17

Buyer has the corporate power and authority to execute and deliver this Agreement, to perform fully its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite action of Buyer. Buyer has duly executed and delivered this Agreement. This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**Section 6.3**     No Conflicts, etc.

The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in a violation of or under (with or without the giving of notice or the lapse of time or both) or result in the acceleration of or give rise to the right of any Person to terminate, modify or cancel under, or result in the loss of any rights, privileges, options or alternatives under, or result in the creation of any Lien on any of Buyer's assets under (a) the articles of organization or operating agreement of Buyer, (b) any Applicable Law applicable to Buyer, or (c) any contract, agreement or other instrument applicable to Buyer, except for such conflicts, violations, defaults, accelerations or rights that, individually and in the aggregate, have not impaired and shall not impair the ability of Buyer to perform any of its obligations under this Agreement. No Governmental Approval or other Consent is required to be obtained or made by Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**Section 6.4**     "AS-IS/WHERE-IS" Purchase After Investigation

**Buyer is purchasing the Purchased Assets AS IS, WHERE IS WITHOUT RECOURSE TO, REPRESENTATION BY, OR WARRANTIES BY, SELLER OF ANY KIND OR DESCRIPTION WHATSOEVER, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AND/OR REPRESENTATIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, PHYSICAL CONDITION, TITLE, POSSESSION, QUIET ENJOYMENT OR THE LIKE AND WITH ALL FAULTS. Buyer has investigated and examined the Purchased Assets and Assumed Liabilities and has been granted full and complete access to each of the Purchased Assets and all books and records related to each of the Assumed Liabilities. Buyer has examined and investigated each of the Purchased Assets and evaluated the Assumed Liabilities to the extent Buyer, in its sole discretion, determined to be appropriate. Buyer has not relied on any representation or statement of Seller or CohnReznick Capital in connection with Buyer's decision to execute or perform under this Agreement or to acquire the Purchased Assets.**

**Section 6.5**     Litigation

As of the date hereof, there is no action, suit or proceeding pending or, to Buyer's knowledge, threatened by or against or affecting Buyer in connection with or relating to the transactions contemplated by this Agreement or of any action taken or to be taken in connection herewith or the consummation of the transactions contemplated hereby.

**Section 6.6**     Brokers, Finders, etc.

18

Neither Buyer nor any of its Affiliates has agreed to pay any fee or commission to any agent, broker, finder, or other Person for or on account of services rendered as a broker or finder in connection with this Agreement or the transactions contemplated hereby.

### Section 6.7   Financial Ability to Perform

Buyer is fully capable from a financial standpoint of performing its obligations under this Agreement and is not aware of any facts, circumstances or conditions that could reasonably be expected to render Buyer financially incapable of performing its obligations under this Agreement. Buyer has, and will at the Closing have, cash, cash equivalents, available lines of credit or other sources of immediately available funds readily available sufficient to enable Buyer to consummate the transactions contemplated by this Agreement to which it is to be a party. Immediately after giving effect to the transactions contemplated by this Agreement, Buyer shall be able to pay its debts as they become due and shall own property having a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities). Immediately after giving effect to the transactions contemplated by this Agreement, Buyer shall have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement with the intent to hinder, delay or defraud either present or future creditors of Buyer.

### Section 6.8   No Collusion

Buyer acknowledges and confirms that the Purchase Price (a) has not been controlled by any agreement among any potential bidders, and (b) has not been collusive with any other bidder.

### ARTICLE VII
### COVENANTS

### Section 7.1   Operations

Seller shall have no obligation to repair or maintain the Purchased Assets and Buyer agrees to accept any and all Purchased Assets in their "AS-IS, WHERE-IS," condition on the Closing Date.

### Section 7.2   Access and Information

(a)     Prior to the Closing, Seller shall (and shall cause its respective Representatives to) give Buyer and its Representatives, reasonable access during normal business hours to, and furnish them with, material documents, records, work papers and other information with respect to, all properties, assets, books, contracts, commitments, reports and records constituting or otherwise relating to the Purchased Assets, as Buyer shall reasonably request. In addition, Seller shall permit Buyer and its Representatives reasonable access to such personnel of Seller during normal business hours as may be necessary to Buyer in its review of the Purchased Assets and the above-mentioned documents, records and information. All such information shall be provided subject to the provisions of the Non-Disclosure Agreement executed by Buyer.

(b)    From and after the Closing, Buyer shall, upon written request, grant Seller or any of its Affiliates or Representatives reasonable access to and provide to Seller or any of its Affiliates any copies of records with respect to any of the Purchased Assets, the Assumed Liabilities or the Business relating to the period up to and including the Closing Date.

**Section 7.3**    Further Actions

As promptly as practicable, each Party will:

(a)    use its commercially reasonable efforts to take all actions and to do all things necessary to consummate the transactions contemplated hereby by the Closing Date;

(b)    file or supply, or cause to be filed or supplied, all applications, notifications and information required to be filed or supplied by such Party pursuant to Applicable Law in connection with the Agreement, the sale and transfer of the Purchased Assets pursuant to this Agreement and the consummation of the other transactions contemplated hereby;

(c)    use its commercially reasonable efforts to obtain, or cause to be obtained, all Consents (including all Governmental Approvals) necessary to be obtained by such Party in order to comply with applicable law and any regulatory procedure, consummate the sale and transfer of the Purchased Assets pursuant to this Agreement and the consummate the other transactions contemplated hereby to the extent such Consents are not provided for or satisfied by the Sale Order (provided that in no event shall Seller be obligated to incur any costs or expenses or provide any financial accommodation or other consideration of any nature to any Person to facilitate obtaining such Consents); and

(d)    promptly inform the other Party of any communication from any Governmental Authority regarding any of the transactions contemplated by this Agreement.  If any party hereto or Affiliate thereof receives a request for additional information or documentary material from any such Governmental Authority with respect to the transactions contemplated by this Agreement, then such Party will use its reasonable efforts to make, or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

**Section 7.4**    Adequate Assurances

Buyer will provide Seller with information regarding Buyer's intended business plans and capital structure on and after the Closing Time, and will cooperate with Seller in communicating with third parties to Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases or Acquired Intellectual Property as may be reasonably necessary to assist Seller in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts, Assumed Real Property Leases, Assumed Equipment Leases and Acquired Intellectual Property.

**Section 7.5**    Further Assurances

20

Following the Closing, each Party shall, from time to time, execute and deliver (or cause to be executed and delivered) such additional instruments, documents, conveyances or assurances and take such other actions as shall be necessary, or otherwise reasonably requested by the other Party, to confirm and assure the rights and obligations provided for in this Agreement and render effective the consummation of the transactions contemplated hereby, at the requesting Party's cost and expense.

**Section 7.6**    <u>Limitations on Duties</u>

Each Party and its Affiliates shall be obligated to perform such duties and only such duties as are specifically set forth in this Agreement and no implied covenants, duties or obligations shall be read into this Agreement or any other agreement against any such Person, other than the duties to act in good faith and in a commercially reasonable manner.

**Section 7.7**    <u>Use of Name</u>

Seller agrees that **it shall (i) as soon as practicable after the Closing Date and in any event within sixty (60) days following the Closing Date, cease to make any use of the name "SkyMall" or any service marks, trademarks, trade names, identifying symbols, logos, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or mark confusingly similar thereto (collectively, the "Seller Marks"), (ii) immediately after the Closing, cease to hold itself out as having any affiliation with Purchaser or any of its Affiliates, and (iii) request that the Bankruptcy Court effect a change in the caption of the Chapter 11 Case so that the words "SkyMall" do not appear in such caption.**

**ARTICLE VIII**
**<u>TAXES</u>**

**Section 8.1**    <u>Taxes Related to Purchase of Assets</u>

All federal, state and local sales and transfer taxes, including all state and local taxes in connection with the transfer of the Purchased Assets, and all recording and filing fees (collectively, "Transaction Taxes") that may be imposed by reason of the sale, transfer, assignment and delivery of the Purchased Assets, and are not exempt under Section 1146(a) of the Bankruptcy Code, shall be paid by Buyer, provided that Seller shall pay all recording and filing fees related to the Chapter 11 Case and any releases, terminations or consents which are necessary to consummate the transactions contemplated hereby. Transaction Taxes do not include any tax in the nature of an income tax, including any capital gains, franchise, excise, inheritance, estate, succession, or gift taxes. Buyer and Seller reasonably will cooperate with each other to minimize any such Transaction Taxes and to determine appropriate taxing authorities and amount of Transaction Taxes, if any, payable in connection with the transactions contemplated under this Agreement. Seller will assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

**ARTICLE IX**
**CONDITIONS PRECEDENT**

**Section 9.1**     Conditions to Obligations of Each Party

The obligations of the Parties to consummate the transactions contemplated hereby at the Closing shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(a)     Entry of Sale Order. The Bankruptcy Court shall have entered the Sale Order.

(b)     No Injunction. Consummation of the transactions contemplated hereby shall not have been restrained, enjoined or otherwise prohibited by any Applicable Law, including any order, injunction, decree or judgment of any court or other Governmental Authority.

(c)     Illegality. No court or other Governmental Authority shall have determined that any Applicable Law makes illegal the consummation of the transactions contemplated hereby, and no proceeding with respect to the application of any such Applicable Law to such effect shall be pending.

**Section 9.2**     Conditions to Obligations of Buyer

The obligations of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the fulfillment (or waiver by Buyer) on or prior to the Closing Date of the following additional conditions:

(a)     Representations; Performance. The representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects, as if made at and as of the Closing Date (except for representations and warranties that are made as of a specific date, which representations and warranties shall be true and correct in all material respects at and as of such respective specific date); provided, however, that the failure of any such representations or warranties to be true and correct on and as of the Closing Time shall not constitute a basis for

22

Buyer to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect. Seller shall have duly performed and complied in all material respects with all covenants and agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(b)     **Transfer and Assumption Documents**. Seller shall have delivered to Buyer at the Closing the items specified in <u>Section 4.2</u>.

**Section 9.3**     <u>Conditions to Obligations of Seller</u>

The obligation of Seller to consummate the transactions contemplated hereby at the Closing shall be subject to the fulfillment (or waiver by Seller), on or prior to the Closing Date, of the following additional conditions:

(a)     <u>Representations; Performance</u>. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects, as if made at and as of the Closing Date. Buyer shall have duly performed and complied in all material respects with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date; <u>provided</u>, <u>however</u>, that the failure of any such representations or warranties to be true and correct on and as of the Closing Time shall not constitute a basis for Seller to refuse to consummate the transactions contemplated hereby unless such failure, either individually or in the aggregate, has or would reasonably be expected to have a material and adverse effect on Buyer's ability to perform its obligations under this Agreement.

(b)     <u>Payment of Purchase Price</u>. Buyer shall have paid to Seller the Purchase Price (net of the Deposit and applicable credits as provided in <u>Section 3.1</u>) and Buyer shall have paid the Cure Amounts for Assumed Contracts, to the extent required pursuant to <u>Section 4.3(b)</u>.

(c)     <u>Transfer and Assumption Documents</u>. Buyer shall have delivered to Seller at the Closing the items specified in <u>Section 4.3</u>.

(d)     <u>Assurance of Future Performance</u>. Buyer shall have provided sufficient adequate assurance of future performance of its obligations under the Assumed Contracts after the Closing, as shall be required by the Bankruptcy Court.

**ARTICLE X**
**TERMINATION**

**Section 10.1**     <u>Termination</u>

This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of Seller and Buyer;

(b)     by Seller or Buyer if the Closing shall not have been consummated on or before the Outside Date; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to

this Section shall not be available to any Party whose breach of any provision of this Agreement results in the failure of the Closing to be consummated by such date;

(c)     upon the entry of an Order of the Bankruptcy Court authorizing the sale of the Purchased Assets to a Person other than Buyer (or an Affiliate of Buyer designated by it); provided, however, that Buyer shall not be permitted to terminate this Agreement upon the entry of such an order if Buyer is determined to be a Backup Bidder (as defined in the Bidding Procedures Order) for any of the Purchased Assets;

(d)     if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated hereby is entered and such Order shall have become a Final Order;

(e)     by Seller, if the Buyer shall have breached any of its representations, warranties, covenants or agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article IX, which breach cannot be or has not been cured within fifteen (15) Business Days after the giving of written notice by Seller to the Buyer specifying such breach; or

(f)     by Buyer, if Seller shall have breached any of their representations, warranties, covenants or agreements contained in this Agreement which would give rise to the failure of a condition set forth in Article IX, which breach cannot be or has not been cured within fifteen (15) Business Days after the giving of written notice by the Buyer to Seller specifying such breach.

A Party desiring to terminate this Agreement pursuant to Section 10.1 shall give notice of such termination to the other Party or Parties.

### Section 10.2    Effect of Termination

If this Agreement is terminated pursuant to the provisions of Section 10.1, then this Agreement shall become void and have no effect, without any liability to any Person in respect hereof or of the transactions contemplated hereby on the part of any Party hereto, or any of its equity holders, Representatives or Affiliates, except for any liabilities expressly set forth below in Section 10.3, and except that each Party will return or destroy all documents, workpapers and other material of any other Party relating to the transactions contemplated by this Agreement, whether so obtained before or after the execution of this Agreement, to the Party furnishing the same.

### Section 10.3    Deposit

If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(b) (except where the failure of the Closing to be consummated by the Outside Date resulted from the breach by Buyer of any provision of this Agreement), Section 10.1(c), Section 10.1(d), or Section 10.1(f), the Deposit and all interest accrued thereon shall be released by the Seller's Designee to Buyer pursuant to the terms of the Section 12.17 below and Seller and Seller's Designee shall have no further liabilities or obligations hereunder.  If this Agreement is terminated pursuant to Section 10.1(b) (where the failure of the Closing to be consummated by the Outside Date resulted from the breach by Buyer of any provision of this Agreement) or Section 10.1(e), the Deposit and all

interest accrued thereon shall be remitted by Seller's Designee to Seller pursuant to the terms of <u>Section 12.17</u> below.

## ARTICLE XI
## BANKRUPTCY COURT MATTERS

**Section 11.1**    <u>Submission to Bankruptcy Court</u>

Seller may file with the Bankruptcy Court this Agreement and such motions, pleadings and notices as may be appropriate in connection therewith.

**Section 11.2**    <u>Buyer's Backup Bid</u>

If a bid by a Prevailing Bidder (as defined in the Bidding Procedures Order) is approved by the Bankruptcy Court and Buyer is determined by Seller to have submitted a Backup Bid in accordance with the Bidding Procedures Order, then (a) Buyer shall remain bound to this Agreement, on its existing terms and at the purchase price bid by Buyer, unless and until the sale to the Prevailing Bidder is consummated or, if later, until the Outside Date, and (b) Buyer's Deposit will be retained until the sale to the Prevailing Bidder is consummated or, if later, the Outside Date. If Buyer's Backup Bid is thereafter accepted as the winning bid, the Outside Date for the Closing shall be extended to the date thirty (30) days after Seller provides notice to Buyer that it has been approved as a winning bidder.

**Section 11.3**    <u>Sale Order</u>

In accordance with the Bidding Procedures Order, Seller will obtain the entry by the Bankruptcy Court of the Sale Order containing typical and customary provisions in form and substance reasonably satisfactory to Buyer and Seller. Buyer will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of a Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under Section 363(m) or any other Section of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) or any other Section of the Bankruptcy Code. Seller will request that the Sale Order provide that it shall be effective and enforceable immediately upon entry by the Bankruptcy Court notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE XII
## MISCELLANEOUS

**Section 12.1**    <u>Casualty and Condemnation</u>

(a)    Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Time. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Time, then with respect to such Purchased Assets Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets; or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such

25

Purchased Assets any condition to Closing would not be satisfied.  If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, Seller will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance. This <u>Section 12.1(a)</u> shall contain Buyer's sole remedy in the event of any casualty.

(b)      If condemnation proceedings are commenced after the date hereof against any Real Property included in the Purchased Assets, Seller shall immediately notify Buyer of such event and all condemnation awards payable to Seller by reason of such condemnation shall be paid or assigned to Buyer at Closing.  Any condemnation proceeds from condemnation proceedings that have already been commenced against any Real Property included in the Purchased Assets described on <u>Schedule 12.1(b)</u> shall be paid to Seller, and Buyer shall have no rights, claims or obligations with respect thereto.  In regards to any condemnation proceedings that have already been commenced against any Real Property included in the Purchased Assets described on <u>Schedule 12.1(b)</u>, Seller covenants that all work required of Seller under the condemnation has or shall be completed at Seller's sole cost by Seller allowing Buyer a credit at Closing equal to the estimated costs of such work as agreed by Buyer and Seller.  This <u>Section 12.1(b)</u> shall contain Buyer's sole remedy in the event of any condemnation.

**Section 12.2**  <u>Expenses</u>

Except to the extent otherwise provided hereby, the Parties shall bear their respective expenses, costs and fees (including any attorneys' or auditors' fees) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith, whether or not the transactions contemplated hereby are consummated (other than enforcement expenses payable pursuant to <u>Section 12.14</u>).

Notwithstanding anything that may be to the contrary in this Agreement, the Buyer shall bear the following expenses:

(a)      all title insurance premiums, escrow charges, if any, and other costs charged by Buyer's title insurance company and/or abstract company in connection with the Buyer's acquisition of the Purchased Assets;

(b)      all fees and expenses incurred in connection with obtaining any UCC searches;

(c)      all survey fees, if any, charged in connection with Buyer's acquisition of the Purchased Assets;

(d)      all fees and expenses incurred by Buyer for any reports and investigations related to Buyer's due diligence and decision to buy the Purchased Assets;

(e)      except as provided in <u>Section 8.1</u>, all Transaction Taxes; and

(f)     except as provided in <u>Section 8.1</u>, all recordation fees in connection with recording any documents required to be recorded in connection with Buyer's acquisition of the Real Property.

### Section 12.3   Payment of Brokers

Buyer acknowledges that Seller has retained CohnReznick Capital to act as its investment banker in connection with the sale of the Purchased Assets and the transactions contemplated by this Agreement.  Seller shall be responsible for any fees due to CohnReznick Capital.  Buyer shall be responsible for any brokerage commission or other fees due to any broker or advisor claiming by, through or under Buyer and, as between Seller and Buyer, shall also be responsible for any loss, liability, damage, cost or expense (including, without limitation, reasonable attorneys' fees) paid or incurred by Seller by reason of any claim to any broker's, finder's or other fee in connection with the transactions contemplated by this Agreement by any such broker or advisor, except to the extent that it is conclusively determined in a judicial proceeding that such fee is payable as a result of an express contract or undertaking by Seller to pay the same.

### Section 12.4   Severability

If any provision of this Agreement, including any phrase, sentence, clause, section or subsection is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

### Section 12.5   Notices

All notices, requests, demands, approvals, consents, waivers and other communications required or permitted to be given under this Agreement (each, a "<u>Notice</u>") shall be in writing and shall be (a) delivered personally, (b) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (c) sent by next-day or overnight mail or delivery by a nationally recognized carrier, or (d) sent by facsimile transmission, provided that the original copy thereof also is sent by one of the other means specified above in this <u>Section 12.5</u>:

If to Buyer:

C&A Marketing, Inc.
2 Bergen Turnpike
Ridgefield Park, NJ 07661
Attn: Chaim Piekarski

with a copy to:
 and

Perkins Coie LLP
2901 North Central Avenue Suite 2000

QB\34219641.3

Phoenix, AZ 85012-2788
Telephone: 1.602.351.8000
Facsimile: 1.602.648.7000
Attn: Jordan Kroop
Email: JKroop@perkinscoie.com

If to Seller:

SkyMall, LLC
1520 E. Pima Street
Phoenix, Arizona 85034
Telephone:  602-528-8659
Attention:  Scott Wiley
Email: swiley@skymall.com

with a copy to:

Quarles & Brady LLP
One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Telephone:  (602) 230-5517
Facsimile:  (602) 417-2980
Attention: Steven P. Emerick
Email: Steve.Emerick@quarles.com

or, in each case, at such other address as may be specified in a Notice to the other Party hereto. Each Notice shall be deemed effective and given upon actual receipt or refusal of receipt.

**Section 12.6**     Headings

The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

**Section 12.7**     Entire Agreement

This Agreement and the Non-Disclosure Agreement executed by Buyer constitute the entire agreement between the Parties relating to the subject matter hereof and are the final and complete expression of their intent. No other prior or contemporaneous negotiations, promises, agreements, covenants, or representations of every kind of nature, whether made orally or in writing, have been made or relied upon by the Parties, or any of them, in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein or in the Non-Disclosure Agreement, or which have not become merged and finally integrated herein or therein; it being the intention of the Parties hereto that in the event of any subsequent litigation, controversy, or dispute concerning the terms and provisions of this Agreement or the Non-Disclosure Agreement, no Party shall be permitted to offer or introduce oral or extrinsic

evidence concerning the terms and conditions hereof that are not included or referred therein and not reflected in writing. This Agreement can only be changed, modified or discharged if consented to in writing executed by the Parties hereto.

### Section 12.8    Counterparts

This Agreement may be executed (including by pdf or facsimile transmission) with counterpart signature pages or in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

### Section 12.9    Governing Law, etc.

This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of Arizona without giving effect to the conflict of laws rules thereof. Buyer and Seller hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court relating to the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in the Bankruptcy Court or that the venue thereof may not be appropriate or that this Agreement or any of such documents may not be enforced in or by the Bankruptcy Court, and the Parties hereto irrevocably agree that all claims with respect to such action or proceeding shall be heard and determined in the Bankruptcy Court. Buyer and Seller hereby consent to and grant the Bankruptcy Court jurisdiction over the person of such parties and over the subject matter of any such dispute and agree that mailing of process or other papers in connection with any such action or proceeding in the manner provided in Section 12.5 or in such other manner as may be permitted by law, shall be valid and sufficient service thereof.

### Section 12.10    Binding Effect

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.

### Section 12.11    Assignment

This Agreement shall not be assignable (whether by contract, operation of law or otherwise) by any Party without the prior written consent of the other Party.

### Section 12.12    No Third Party Beneficiaries

Nothing in this Agreement shall confer any rights upon any Person other than the Parties hereto and their respective successors and permitted assigns.

### Section 12.13    Amendment; Waivers; etc.

No discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by each of the Parties (and subject to the approval of

29

the Bankruptcy Court, if required). Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time. Neither the waiver by any of the Parties hereto of a breach of or a default under any of the provisions of this Agreement, nor the failure by any of the Parties, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any such provisions, rights or privileges hereunder. No amendment or modification of this Agreement shall be effective unless in writing executed by both Parties. No amendment, or modification hereunder shall be valid or binding unless approved by the Bankruptcy Court.

### Section 12.14    Enforcement Expenses

Each Party shall pay its own expenses, including attorneys' fees, in connection with this Agreement and the performance of their respective obligations hereunder, provided, however, that in the event any suit, action, or proceeding is brought to construe or enforce the terms and conditions of this Agreement or the rights of the Parties hereunder, the losing Party shall pay to the prevailing Party all court costs and attorneys' fees and costs incurred in such suit, action, or proceeding to be fixed in amount by the Bankruptcy Court. Attorneys' fees and costs incurred in enforcing any judgment in respect of this Agreement are recoverable as a separate item. This Section 12.14 is intended to be severable from the other provisions of this Agreement and to survive the Closing and any judgment and, to the maximum extent permitted by law, shall not be deemed merged into any such judgment.

### Section 12.15    Bulk Sales

To the extent they may apply, the Parties hereby waive compliance with the provisions of the bulk sales laws of any jurisdiction.

### Section 12.16    Time is of an Essence

Time is of an essence with respect to each and every provision of this Agreement.

### Section 12.17    Terms of Deposit

The Deposit and any supplement thereto shall be held by Closing Agent either (i) in kind in the case of a cashier's check payable to Seller's Designee, or (ii) if practicable in Seller's Designee's sole discretion, in a segregated interest-bearing account at a depository approved by the Office of the United States Trustee under the Buyer's federal employer tax identification number, and shall be disbursed in accordance with the terms and conditions of this Agreement, unless otherwise directed by written notice to Seller's Designee signed by Seller and Buyer. In the event of a dispute between the parties, Seller's Designee shall deposit the funds with the Bankruptcy Court until a Final Order, judgment or decree, beyond appeal, directing the disposition of the Deposit, has been issued and shall thereafter disburse or cause the Bankruptcy Court to disburse the Deposit, in accordance therewith.

### Section 12.18    Buyer Indemnification Obligation

After the Closing, Buyer shall indemnify Seller against and shall hold it harmless from any and all liabilities, losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Seller may suffer or incur by reason of (i) Seller's defense of any claim, suit or proceeding made or commenced against it arising out of obligations of Seller that were expressly assumed by Buyer hereunder and only expressly for liabilities, claims or amounts arising or accruing after the Closing Date; or (ii) any finder's fee or broker's fees incurred by Seller in connection with the transactions contemplated hereby, other than expressly provided for herein. Seller shall provide written notice to Buyer of any claim or dispute as to which indemnification is provided under this Section within ten (10) business days of receipt of written notice by Seller of the commencement, or threatened commencement, of any such action; provided that the failure to provide such notice will not affect any rights hereunder except to the extent Buyer is materially prejudiced thereby. Seller, on not less than thirty (30) days' notice to Buyer, may make settlement of such claim, litigation or other proceeding with Buyer's consent, such consent not to be unreasonably withheld, and such settlement shall be binding on Seller and Buyer for the purposes of this Section; provided, however, that, if within said thirty-day period Buyer shall, in writing, have requested Seller to contest such claim, or to defend against such litigation or other proceeding, then Buyer shall have the right and obligation to contest such claim or to defend against such litigation or other proceeding on its own behalf and on behalf of Seller, with counsel of its own choosing, but Seller may also, in its discretion, participate in such contest or defense on its own behalf and with counsel of its own choosing. If Buyer shall have failed, neglected or refused to contest such claim or to defend against such litigation or other proceeding, Buyer shall reimburse Seller for the expenses incurred by Seller in such contest or defense. Any payment or settlement resulting from such contest or defense, together with Seller's costs thereof, shall be binding on Seller and on Buyer for the purposes of this Section.

### Section 12.19   Survival

The representations and warranties contained in this Agreement, and any certificate and other documents delivered pursuant to this Agreement shall terminate at the Closing. The covenants and agreements contained in this Agreement and any certificate and other documents delivered pursuant to this Agreement shall not survive the Closing; provided, however, that any covenant or agreement contained in this Agreement that by its terms, is to survive the Closing Date or which is to be performed after the Closing Date shall survive the Closing Date for the duration of such covenant or agreement.

### Section 12.20   Exclusivity

The representations, warranties, covenants and agreements contained in this Agreement are exclusive, and the Parties confirm that they have not relied upon any other representations, warranties, covenants and agreements as an inducement to enter into this Agreement or otherwise.

### Section 12.21   Remedies

Subject to the remedy limitations contained in this Agreement, no remedy herein or otherwise conferred upon Seller or Buyer shall be considered exclusive of any other remedy, but

31

the same shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

     IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.


_____


By: _____

Its: _____


SKYMALL, LLC


By: _____
Scott Wiley, Chief Financial Officer and Acting
Chief Executive Officer


[_____]

32

Need to Discuss Schedules - To Be Finalized

Schedule 2.1(d)

Acquired Intellectual Property

TBD

Schedule 2.3

Certain Excluded Assets

TBD

Schedule 3.3

Allocation of Purchase Price

TBD

Schedule 5.4

Litigation

TBD

Schedule 5.5

Permitted Liens and Exceptions

TBD